|  | |
|---|---|
| Judge: | Hon. Karen A. Overstreet |
| Chapter: | 11 |
| Hearing Date: | December 20, 2013 |
| Hearing time: | 9:30 a.m. |
| Hearing Site: | 700 Stewart St., #7206 |
|  | Seattle, WA 98101 |
| Response Date: | December 13, 2013 |

# UNITED STATES BANKRUPTCY COURT FOR THE
# WESTERN DISTRICT OF WASHINGTON AT SEATTLE

IN RE:

JACOB BUTTNICK,

Debtor-in-Possession.

Case No. 13-20151-KAO

DECLARATION OF JASON P. AMALA IN SUPPORT OF MOTION TO APPOINT A CHAPTER 11 TRUSTEE

JASON P. AMALA declares under penalty of perjury of the laws of the State of Washington as set forth below.

1. I am over the age of 21 and am competent to make this declaration.

2. I am an attorney with the law firm of Pfau Cochran Vertetis Amala PLLC and we represent Lance Miyatovich and Jolan, Inc (hereinafter the "Jolan Group") in the above-captioned case. We have represented the Jolan Group since we filed suit on their behalf against Jacob Buttnick on April 23, 2010, in King County Superior Court, case number 10-2-15302-1. We represented their interests throughout that litigation and during the subsequent efforts to collect on the resulting settlement and judgment against Mr. Buttnick.

3. During discovery in the litigation in King County Superior Court, Mr. Buttnick produced a "Recession Agreement" between himself and Otmane Bezzaz regarding Mr.

DEC OF JPA ISO MOTION TO APPOINT
CHAPTER 11 TRUSTEE

Page 1

**Wood & Jones, P.S.**
303 N. 67th Street
Seattle WA 98103-5209
(206) 623-4382

Case 13-20151-TWD    Doc 26    Filed 11/29/13    Ent. 11/29/13 11:49:15    Pg. 1 of 18

Buttnick's interest in the J&M Restaurant, LLC. The Recession Agreement is dated May 2, 2010, which is a little over a week after we filed suit against Mr. Buttnick. In the Recession Agreement, Mr. Buttnick agrees to give up his 45% interest in the J&M Restaurant, LLC, to Mr. Bezzaz. Attached hereto as Exhibit "1" is a true and correct copy of that Recession Agreement. We subsequently amended the complaint and added claims against Mr. Buttnick, Mr. Bezzaz, and the J&M Restaurant, LLC, for fraudulent transfer.

4. On February 16, 2011, we deposed Mr. Buttnick during the litigation in King County Superior Court. During his deposition, Mr. Buttnick testified that he received nothing in return for executing the "Recession Agreement" with Mr. Bezzaz. Instead, he testified that he gave up his 45% interest in the J&M Restaurant, LLC, because Mr. Bezzaz is "a nice fellow and he asked for it." Mr. Buttnick further testified that he had discussed with Mr. Bezzaz the possibility that he would take the 45% interest back from Mr. Bezzaz once Mr. Buttnick was finished with the litigation involving the Jolan Group. Attached as Exhibit "2" is a true and correct copy of portions of the deposition of Mr. Buttnick.

I declare under penalty of perjury under the laws of the United States of America, 28 U.S.C. ¶ 1746, that the foregoing is true and correct.

Dated this 27th day of November 2013 in Seattle, Washington.

PFAU COCHRAN VERTETIS AMALA PLLC

By _____
  Jason P. Amala, WSBA No. 37054
  jason@pcvalaw.com
  Attorneys for Jolan Group

DEC OF JPA ISO MOTION TO APPOINT
CHAPTER 11 TRUSTEE

Page 2

**Wood & Jones, P.S.**
303 N. 67th Street
Seattle WA 98103-5209
(206) 623-4382

Case 13-20151-TWD    Doc 26    Filed 11/29/13    Ent. 11/29/13 11:49:15    Pg. 2 of 18

# EXHIBIT 1

This Rescission Agreement entered into this _21_ day of _May_, _2010_, by and between Jacob G. Buttnick and Otmane Bezzaz, together, the Parties.

## RECITALS

Whereas, the Parties entered into an agreement to form the J&M Restaurant, LLC ("LLC"); and

Whereas, the Agreement required that each party contribute certain funds for the formation and operation of the LLC; and

Whereas, Jacob G. Buttnick has not contributed any funds for the formation and operation of the LLC;

**Now Therefore**, the Parties agree as follows:

1. RESCISSION. For good and valuable consideration, including the forgiveness of any debt or obligation on the part of Jacob G. Buttnick, the receipt of which is hereby acknowledged, the Parties mutually agree that the agreement between the Parties regarding the creation, formation and ownership of the LLC is hereby rescinded, terminated, and cancelled as if said agreement had never been made.

2. OPTION TO PURCHASE. For good and valuable consideration, the receipt of which is hereby acknowledged, the Parties mutually agree that on or before September 30, 2012, Jacob G. Buttnick may exercise an option to purchase an ownership interest in the LLC under the same terms and conditions as the Parties' original agreement.

3. RELEASE. The Parties hereby release and forever hold harmless each other and the members, officers, managers, agents, attorneys, and employees of each, or any of their affiliates, predecessors, successors, or assigns, from any obligation or claim of any and all kinds whatsoever, whether known or unknown, whether disclosed or undisclosed, with respect to any and all matters pertaining to the creation, formation and ownership of the LLC.

4. MERGER. This Agreement constitutes the entire agreement and understanding of the Parties and supersedes any oral agreements, understandings, negotiations, and proposals relating directly or indirectly, to any interest therein.

5. VENUE. Venue for any proceeding herein shall be in the courts of King County, Washington, and each party shall be responsible for their own attorneys fees and costs.

6. SUCCESSORS. The obligations and terms of this Agreement are binding upon the heirs, successors, and assigns of each party.

7. WARRANTY OF SIGNATURE. The signatories hereto represent and warrant that they have read and understand this Agreement and have the authority and approval to execute it on behalf of themselves and/or their respective entities.

_____       _____
JACOB G. BUTTNICK                                     OTMANE BEZZAZ

# EXHIBIT 2

Transcript of the Testimony of

## Jacob G. Buttnick
February 16, 2011

## Jolan, Inc. v. Buttnick
No. 10-2-15302-1 SEA



## Byers and Anderson, Inc.
**Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316**  Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Tacoma, WA 98403-3360
Tacoma: **253 627-6401**  Fax: **253 383-4884**

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF KING

JOLAN, INC., and LANCE MIYATOVICH,  )
                                    )
            Plaintiffs,             )
                                    )
       vs.                          ) No. 10-2-15302-1 SEA
                                    )
JACOB G. BUTTNICK,                  )
                                    )
            Defendant.              )
                                    )
                                    )

DEPOSITION OF JACOB G. BUTTNICK

February 16, 2011

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square       2208 North 30th Street, Suite 202
600 University St.     Tacoma, WA 98403
Suite 2300             (253) 627-6401
Seattle, WA 98101      (253) 383-4884 Fax

(206) 340-1316         scheduling@byersanderson.com

(800) 649-2034         www.byersanderson.com

Serving Washington's Legal Community Since 1980

Page 66

1  down one day and --
2  A  I don't recall that.
3  Q  What do the terms for that lease require of Otmane
4     Bezzaz in terms of the amount of money or rents owing?
5  A  We did not put -- you mean how much he owed on the
6     lease?
7  Q  Right.
8  A  Oh, how much he was obligated to pay for the lease.
9  Q  On a -- monthly basis?
10 A  I think it says $9,000.
11 Q  And is that based on a market value analysis that you
12    did of any kind?
13 A  Not that I recall.
14 Q  Did he get credit in the lease for the $40,000 that he
15    had paid to the bank for back amounts owed?  Were
16    there any other payments made by either you or him in
17    executing that lease?
18 A  What payments would I have made?
19 Q  I don't know.  That's what I'm wondering, if there is
20    any.
21 A  None by me.  He simply assumed that liability to pay
22    the rent.
23 Q  Did he pay, for example, for any fixtures in the
24    building or a security deposit or any other lump sums?
25 A  Depending what you mean by fixtures.  What are

Page 67

1     fixtures?
2  Q  Well, fixtures could be anything inside the J&M Cafe,
3     the same kind of stuff that was pulled out by Harry
4     Poll.
5  A  By Harry Poll.  He got the place running.  That's all
6     I know was in his hands.  I don't know what he put in
7     there or anything else.
8  Q  What I'm wondering, though, is in the lease that you
9     entered into with Otmane Bezzaz, was he required to
10    make any payments upfront for anything like fixtures
11    or a security deposit?
12 A  No.
13 Q  Did he get credit from the $40,000 that he paid for
14    back amounts you owed in terms of that applying to the
15    security deposit or paying for the fixtures or the
16    name?
17 A  No.
18 Q  Okay.  What did the lease give to Otmane Bezzaz?
19 A  The right to be in the J&M.
20 Q  Anything else, any permission to use the name J&M Cafe
21    or permission to use the fixtures?
22 A  The answer to those questions is no and no.
23 Q  I think you clarified earlier that you were one of the
24    owners of J&M Cafe for a period of time, right?
25 A  Yes.

Page 68

1  Q  And remind me of what that time period was?
2  A  A number of months.  I really have no idea.
3  Q  Was it from the point of this lease being given to
4     Otmane Bezzaz forward?
5  A  Yes.
6  Q  Okay.  And are you listed as one of the owners in the
7     lease that you executed with Otmane Bezzaz?
8  A  What do you mean by "listed"?
9  Q  I mean, are you identified in the lease agreement as
10    being one of the lessors?
11 A  Lessors?
12 Q  One of the tenants?
13 A  I don't know the -- the lease does not refer to that
14    as far as I know.
15 Q  Is the -- is the lessor in the agreement that you
16    executed with Otmane Bezzaz Otmane Bezzaz himself or
17    is it a business name?
18 A  Lessor or lessee?  He was never the lessor.
19 Q  Lessee.
20 A  Okay.  He is the lessee in the lease.  That's all I
21    know.
22 Q  I mean, is it a business name that's the lessee or is
23    it Otmane Bezzaz himself?
24 A  I believe it's Otmane.
25 Q  Do you have an obligation to pay yourself lease

Page 69

1     amounts under that lease with Otmane Bezzaz?
2  A  Not that I know of.
3  Q  So what ownership interest did you have in the J&M
4     Cafe?
5  A  I had a 45 percent interest.
6  Q  And what did you give in consideration for the 45
7     percent interest?
8  A  Nothing that I can recall.
9  Q  And so why did Otmane Bezzaz agree to give you 45
10    percent ownership of the J&M Cafe?
11 A  Because he's a nice fellow.
12 Q  Was that the only reason?
13 A  As far as I know.
14 Q  Do you have a written agreement showing why you got 45
15    percent --
16 A  No.
17 Q  -- interest in the business?
18 A  No.
19 Q  At what point did you no longer have an interest in
20    the J&M Cafe?
21 A  When I signed the interest back to him.
22 Q  Okay.  And when did that happen?
23 A  I don't recall.  A number of months ago.  I don't
24    recall.
25 Q  Were attorneys involved in you giving up that

```
 1    interest?
 2  A No, not that I know of.
 3  Q Why did you give up the interest?
 4  A Because he's a nice fellow and he asked for it.
 5  Q Any other reason?
 6  A None that I can think of.
 7  Q How did the issue come to a point where you had
 8    decided to give up the interest?
 9  A We sat down and we talked about it and we resolved
10    that I would.
11  Q Okay. Tell us about that discussion. When did it
12    happen?
13  A Sometime before I gave up the interest. I don't
14    recall exactly when.
15  Q Did you give up the interest in April of 2010, does
16    that sound about right?
17  A It could have been that long ago, but I'm uncertain.
18    I'd have to look at the agreement.
19  Q And was the agreement in the nature of a rescission of
20    your interest, is that what you called it?
21  A I'm not an attorney. It might be called that. I
22    think maybe it might be called that.
23  Q But in this instance you didn't have attorneys working
24    on it, right?
25  A I said I'm not an attorney.
```
Page 70

```
 1  Q Right. But my point is that you weren't using
 2    attorneys to develop whatever this rescission was?
 3  A I never used an attorney. I personally never used an
 4    attorney.
 5  Q So I'm wondering then what did you call it as you
 6    created this thing where you gave up your interest?
 7  A Well, if you want to call it rescission, like I say,
 8    I'm not an attorney. A rescission, withdrawal,
 9    whatever it's called. I don't know.
10  Q I just want to know what you called it since you
11    drafted it.
12  A I would call it just my giving my interest back to
13    Otmane.
14  Q Did Otmane draft it or did you draft it?
15  A Otmane drafted it.
16  Q And did he have a lawyer working on drafting it?
17  A I have no idea.
18  Q Did it look like a lawyer document or a hand
19    scratcher?
20  A I'm not an attorney to make a decision like that. I
21    don't know those kinds of things.
22  Q I mean, was it on a napkin or was it on --
23  A It was not a napkin. It was on a piece of paper,
24    white stationery paper.
25  Q So the two of you sat down and just hammered this out
```
Page 71

```
 1    and you said, "Hey, I'm going to give up my interest"?
 2  A No. He brought it to me.
 3  Q And so what did he say?
 4  A It says that I'm giving up my interest of 45 percent.
 5  Q Did you want to give it up?
 6  A Yes, or else I wouldn't have done it.
 7  Q I mean, you could have been forced to give it up, but
 8    if I understand your testimony, you're saying that you
 9    voluntarily gave it up?
10  A That's correct.
11  Q Had he discussed the issue with you before bringing
12    you a piece of paper?
13  A Oh, yes. Oh, yes.
14  Q Tell us about the discussions.
15  A He simply decided that he would like to have the
16    entire thing in his name.
17  Q Did you have an ownership interest in the J&M Cafe for
18    less than five months or six months?
19  A Whatever the time was that we had it.
20  Q And during the six months in which you had an
21    ownership interest did you receive any money from the
22    operation of the cafe?
23  A No.
24  Q So why did you have the ownership interest?
25  A Because as I stated previously, he wanted to give it
```
Page 72

```
 1    to me.
 2  Q And am I correct in understanding that at this point
 3    you don't have any idea why he wanted you to give it
 4    up after six months?
 5  A He just wanted the entire thing for himself. That's
 6    all I know.
 7  Q Did -- I think you said that you read his deposition
 8    testimony, right?
 9  A No. I was incorrect on that. I simply saw some of
10    the things he did, was told some of the things he did.
11    I did not read -- I didn't know what that was. I'm
12    not an attorney. I saw some of the points he had
13    raised but I did not read it.
14  Q And where did you see points that he had raised?
15         MR. THOMASON: Objection; calls for
16  attorney/client privilege communication.
17         MR. COCHRAN: I don't know if it
18  does at this point. That's why I'm asking.
19  Q (By Mr. Cochran) What did you see?
20  A With my attorney.
21  Q What were you looking at that raised these issues?
22         MR. THOMASON: Same objection.
23         MR. COCHRAN: Go ahead.
24         THE WITNESS: We -- we simply -- he
25  reviewed to me some of the things in Otmane's
```
Page 73

## Page 74

1 deposition.
2 Q (By Mr. Cochran) Okay. What you just testified just
3 now was that he told some things to you?
4 A That's correct.
5 Q Earlier I understood you said that you looked at
6 something. Did you look at anything?
7 A No. He simply told me things and we talked about
8 things that were in the deposition.
9 Q Do you know whether Otmane Bezzaz testified about why
10 he asked you to rescind your interest in the J&M Cafe?
11 A I don't recall exactly what he said about that, but it
12 was done on a friendly basis. It was done.
13 Q Have you talked to Otmane Bezzaz in the last two
14 weeks?
15 A Oh, sure.
16 Q Did you talk to him about his deposition?
17 A No.
18 Q No mention of the lawsuit?
19 A Oh, we talked a little bit about the lawsuit, but --
20 Q Okay. What did you talk about in terms of the
21 lawsuit?
22 A Well, he knows there's a lawsuit and asked me how's it
23 going, and I mentioned there's a deposition coming up,
24 that's that.
25 Q Did you talk to him about your testimony that you

## Page 75

1 anticipated giving about the ownership interest that
2 you had in the cafe and how that came about and why it
3 disappeared?
4 A No.
5 Q So you understand that the lawsuit in this case filed
6 by Jolan against yourself was filed and served on you
7 in March of 2010, right?
8 A Sometime in there I guess, yeah.
9 Q And are you aware that you gave up your interest in
10 the J&M Cafe within a couple weeks of the lawsuit
11 being filed?
12 A Whatever the time was.
13 Q Was there a cause and effect there?
14 A Not that I know of.
15 Q When you think back, was one of the reasons you gave
16 up the interest because the lawsuit was filed against
17 you?
18 A No.
19 Q Does Otmane Bezzaz feel that way, that he asked you to
20 give up your interest because of the lawsuit?
21 A Not that I know of.
22 Q Is there a strategic benefit of giving up the interest
23 in terms of this lawsuit?
24 A To me or to him?
25 Q To both of you.

## Page 76

1 A I don't know what's with him. As far as to me, I
2 simply am a friend of his. That's why I gave it up.
3 Q Is one of the reasons why you gave it up because
4 you're disposing of an asset that is potentially
5 recoverable in this lawsuit?
6 A No.
7 Q Did you have a discussion with Otmane Bezzaz about
8 that?
9 A No.
10 Q Do you have plans to -- is he going to magically out
11 of his friendship give you an interest back after this
12 lawsuit's over with?
13 A I don't know.
14 Q Did you discuss that?
15 A Not yet.
16 Q Is it likely that you will resume an ownership
17 interest after this lawsuit's finished?
18 A I have no idea. We haven't discussed it.
19 Q It's possible out of your friendship that that may
20 occur?
21 A Anything is possible.
22       MR. COCHRAN: I bet. Let me ask
23 about some of the defenses that you've raised in your
24 answer, and I don't know if you've seen those for a
25 while, but let me give you a copy of that.

## Page 77

1       (Exhibit No. 1 marked for
2       identification.)
3
4       THE WITNESS: I'm going to have to
5 use the bathroom now.
6       MR. COCHRAN: Sure.
7       (Recess 11:53 to 11:56 a.m.)
8
9 Q (By Mr. Cochran) Mr. Buttnick, before I ask about
10 Exhibit 1, let me ask a couple things to make sure I'm
11 clear on the record.
12 Did you receive an income stream of any kind from
13 the operation of the J&M Cafe as a result of your 45
14 percent ownership?
15 A No.
16 Q Did you receive an income stream from lease amounts
17 owed by the J&M Cafe from November '09 to the present?
18 A No.
19 Q In other words -- and I may not have made that clear.
20 Has J&M Cafe as now operated by Otmane Bezzaz paid
21 amounts owing under the lease on a monthly basis to
22 you?
23 A He has instead made the payment on the building which
24 amounts to the same thing. No.
25 Q 9,000 a month roughly?

| | |
|---|---|
| 1  value of the J&M business at that time was $870,000? | 1  My question to you is that was not accurate at the |
| 2  A  **I have not any idea about that whatsoever. It didn't** | 2  time of March 7, 2008? |
| 3  **concern me. As I mentioned, if he got 20 million for** | 3  A  **That may not have been, that's right. I think that's** |
| 4  **it, that's fine with me, as long as I got my things** | 4  **correct. But it would be subject to legal look-over** |
| 5  **that have to be done for me.** | 5  **on these documents, but you could be right about that.** |
| 6  Q  It's an important issue potentially now for you in | 6              (Exhibit No. 18 marked for |
| 7  front of a jury if we're talking about whether you | 7              identification.) |
| 8  tortuously interfered with Jolan's right to sell the | 8 |
| 9  business. Do you have an opinion about whether | 9  Q  (By Mr. Cochran) So Exhibit 18 is an April 2, 2008 |
| 10  870,000 was the market value of the J&M business? | 10  letter from Brian Read of the Siderius firm to counsel |
| 11  A  **I have no idea. Absolutely no idea.** | 11  for Jolan. Have you seen this document before? |
| 12          MR. COCHRAN: I'll get another | 12  A  Yes. |
| 13  document marked. | 13  Q  On the last page, or last paragraph, rather, of Page 2 |
| 14              (Exhibit No. 17 marked for | 14  it says, and I'll quote, "We understand that Jolan, |
| 15              identification.) | 15  Inc. has been negotiating for the sale of the J&M |
| 16 | 16  business notwithstanding that Mr. Buttnick has not |
| 17  Q  (By Mr. Cochran) Feel free to take time to read all | 17  consented to such a proposed assignment." And that is |
| 18  the pages. | 18  consistent with the position you'd been taking all the |
| 19  A  **Thank you. Okay. I've concluded.** | 19  way up to April 2, 2008, correct? |
| 20  Q  Have you ever seen this letter before? | 20  A  **Correct.** |
| 21  A  **Yes.** | 21  Q  It goes on to say, "We wish to reiterate Mr. Buttnick |
| 22  Q  And you consulted with Mr. Siderius before sending it? | 22  has the right to refuse consent in his sole |
| 23  A  **Yes. Mr. Siderius's firm sent it.** | 23  discretion," correct? |
| 24  Q  Right. But his letter indicates that you and he have | 24  A  **Mm-hm.** |
| 25  looked at it, you and he are confused about a couple | 25  Q  Again I ask you, did that sole discretion include |
| Page 174 | Page 176 |
| 1  issues from the Upward Swing offer. And so as I | 1  motivation such as that you wanted to put Jolan out of |
| 2  understand it anyway, you were in direct consultation | 2  business so you yourself could acquire an ownership |
| 3  with Mr. Siderius about the Upward Swing offer, right? | 3  interest at some point in J&M Cafe? |
| 4  A  **Yes.** | 4          MR. THOMASON: Objection; asked and |
| 5  Q  On the second page down in the last paragraph of that | 5  answered. |
| 6  page, it says, and I'll quote, "Please understand that | 6          MR. COCHRAN: Go ahead. |
| 7  Mr. Buttnick does not oppose consideration of a new | 7          THE WITNESS: The answer is |
| 8  tenant and operator of the J&M Cafe & Card Room | 8  absolutely not. |
| 9  business. Most likely a new lease will be required." | 9  Q  (By Mr. Cochran) You would agree that that would have |
| 10  Is that consistent with your recollection? | 10  been an improper reason? |
| 11  A  **Yes.** | 11  A  **No, I'm not saying that. That's a legal opinion. But** |
| 12  Q  And the new lease terms that you were requiring at | 12  **that wasn't any thought on my part. I like rent** |
| 13  that time included a change from a $12,000 a month | 13  **coming in.** |
| 14  rent to $14,000 a month rent, right? | 14  Q  Or income coming in, whether it's rent or monies out |
| 15  A  **No, not necessarily.** | 15  of the -- out of the business operation, right? Would |
| 16  Q  In that same paragraph it says, "Mr. Miyatovich and | 16  it have mattered to you which way the money was |
| 17  Mr. Eagle are personal guarantees on the existing | 17  coming? |
| 18  lease." That wasn't accurate as of March 7, 2008, was | 18  A  **I knew I had rent coming in. I'm a poor operator of** |
| 19  it? | 19  **any kind of a place. I knew I couldn't operate a** |
| 20  A  **I'm sorry. What's the question again, please?** | 20  **place.** |
| 21  Q  In this letter in Exhibit 17, the March 7, 2008 letter | 21  Q  ==Which is ultimately why you had Otmane Bezzaz be the== |
| 22  from Mr. Siderius, in the last paragraph on Page 2 in | 22  ==operator of the place and you had a 45 percent== |
| 23  the middle of the paragraph it says, and I'll quote, | 23  ==interest, right?== |
| 24  "Mr. Miyatovich and Mr. Eagle are personal guarantees | 24  A  ==**Otmane came in because I was about to lose the**== |
| 25  on the existing lease." | 25  ==**building. That's the only reason -- he didn't come in**== |
| Page 175 | Page 177 |

Page 178

1  anytime before. He came in and saved the building.
2  He says what do you want, I'll operate the place. I
3  says fine. At that point I was within days of losing
4  the building.
5  Q Did you make an offer in the bankruptcy proceedings to
6  buy the J&M business?
7  A Yes.
8  Q For how much?
9  A $25,000.
10 Q Substantially lower than the market value for the J&M
11 business at that time?
12 A I have no idea what a closed business was worth.
13 Q But you did know that J&M had been getting bona fide
14 offers of $880,000 and $870,000?
15 A Fine. This was a closed business.
16             MR. COCHRAN: I've got one more.
17                (Exhibit No. 19 marked for
18                 identification.)
19
20 Q (By Mr. Cochran) Exhibit 19 is a letter dated June 6,
21 2008 from attorney Brian Read of the Siderius firm
22 sent to Jolan, Inc. Did you authorize this letter?
23 A Yes.
24 Q No. 2 on Page 1 references insurance and requirements
25 of insurance?

Page 179

1  A No. 2, yeah.
2  Q Can you point to anything in the original lease
3  agreement from 1993 or the modified and amended lease
4  in 2002 that requires specifically insurance for
5  assault and battery?
6  A Do you want me to take a look at the lease?
7  Q Please. No. 2 is the -- Exhibit No. 2 is the 1993
8  lease.
9  A All right. I have the lease.
10 Q Can you point to anything in there that requires
11 insurance specifically to cover assault and battery?
12             MR. THOMASON: Asks for a legal
13 conclusion.
14             MR. COCHRAN: Go ahead.
15             THE WITNESS: My attorney felt there
16 was. I'm just looking over the paragraph now. He
17 felt on very solid ground having to do this, and...
18 I'm not a lawyer, but I see what the fourth line said.
19 Q (By Mr. Cochran) Go ahead and read that, if you
20 would.
21 A "Insuring tenant against any liability arising out of
22 the ownership, use, occupancy, or as maintenance of
23 the premises and the pertinent areas, and listing
24 landlord as an additional insured on any type of
25 liability."

Page 180

1  Q Anything specifically, though, addressing expressly
2  the issue of assault and battery?
3  A No, but he did take it out from an insurance man. He
4  knew about it. He had it for many years.
5  Q But my question, though, is: Does anything in the
6  lease --
7  A It does not mention assault. It just says any type of
8  liability, and that includes that.
9  Q Did --
10 A That's my -- go ahead.
11 Q Did you ever ask Martin Bernstein for advice on how to
12 prevent Jolan, Inc. from selling its J&M business?
13 A Absolutely not.
14 Q Did you ever tell him that you wanted to take the J&M
15 Cafe from Lance Miyatovich and Jolan, Inc.?
16 A No. That's an absolute lie, in lieu of the man saying
17 it.
18 Q What's that?
19 A Well, I consider the source, but that's an absolute
20 lie.
21 Q Did you ever tell Martin Bernstein that you wanted to
22 keep the J&M Cafe business for yourself?
23 A No.
24 Q Did you ever tell him that you wanted to try to stop
25 the sale of the J&M business by Jolan, Inc.?

Page 181

1  A Of course not. I couldn't run a business. What would
2  I do with it? No.
3  Q Did you ever tell him you wanted to force Lance
4  Miyatovich and his company into bankruptcy?
5  A No.
6  Q What other work did you have Martin Bernstein do for
7  you other than some negotiations with respect to
8  Jolan?
9  A Might have been some other issue come up, not with
10 J&M, but 99 percent was talking to the J&M which I
11 should have talked to directly.
12 Q What other work did he do for you?
13 A I don't recall. And there may not have been any --
14 any other. Basically I think it was almost a hundred
15 percent this thing with J&M.
16 Q Anything else you can remember, any other work?
17 A I'm sorry?
18 Q Any other work, though, that you can remember that he
19 did?
20 A No.
21 Q Was there any one particular precipitating issue that
22 caused you and Martin Bernstein to have a falling out?
23 A Any beside what?
24 Q I'm saying, was there any?
25 A I think I mentioned to you before that this estoppel

**Page 194**

1  A  Oh, my gosh. Mark.
2     MR. MIYATOVICH: Maberry.
3  Q  (By Mr. Cochran) Does Maberry sound right?
4  A  Yeah, that's it.
5  Q  From Kuresman Insurance?
6  A  Yeah, up by the lake up there.
7  Q  Did Mark Maberry inform you at any point that it was
8     impossible for a business like J&M Cafe to get $2
9     million for an endorsement for assault and battery?
10 A  Yes, because he had it before. Sure it was.
11 Q  That it was possible or impossible?
12 A  He said it was possible. But the -- one of the
13    problems was he had had all his troubles there with
14    the police and everything, so it -- he wasn't sure. I
15    guess he wasn't sure. That's going back a few years.
16 Q  Who, that Maberry wasn't sure, you mean?
17 A  I forget if he said -- he said he had it for him in
18    the past, he could probably get it for him. But there
19    was some mention of the -- you know, the trouble in
20    there, and it might have cost more or something like
21    that. I don't recall.
22         (Exhibit No. 25 marked for
23          identification.)
24
25 Q  (By Mr. Cochran) Mr. Buttnick, I'm going to have you

**Page 195**

1     look at Exhibit 25. If you can, tell us what this
2     document is, Exhibit 25 that just got marked.
3  A  Oh. Yes.
4  Q  Okay. So tell us what it is, if you would.
5  A  Well, I don't understand it too well. I mean, I don't
6     understand the legal things, but we went down to I
7     think the secretary of state's office and we formed
8     this company, and I had 45 percent of the company.
9  Q  So you and Mr. Bezzaz went down to the secretary of
10    state's office to do this?
11 A  Yes.
12 Q  Did you drive down together?
13 A  I believe so.
14 Q  And did Mr. Shulkin come with you?
15 A  No.
16 Q  Did he have discussions about what role you would play
17    in this new corporation, the J&M Restaurant
18    corporation?
19 A  No.
20 Q  Had you discussed the formation of the corporation
21    very long before this was executed which is on, what,
22    October 26, 2009?
23 A  I forget. I was finishing with Shulkin at that point,
24    and I don't recall if we brought this thing up for his
25    signature. I don't know. But he definitely did not

**Page 196**

1     go down there.
2  Q  So just to confirm now, this doesn't indicate it, but
3     you've confirmed that you received a 45 percent
4     interest in the J&M Restaurant, LLC, correct?
5  A  Correct.
6  Q  You didn't contribute to any startup costs, right?
7  A  That's correct.
8  Q  You didn't contribute to any money at all to the
9     operation of this LLC, correct?
10 A  That's correct.
11 Q  You didn't have any obligation in terms of running it?
12 A  No. That's correct.
13 Q  Do you know how much the startup costs were?
14 A  I know they were considerable, but I haven't got the
15    exact amount. I know there was -- it was over a
16    hundred thousand dollars, but I don't know exactly.
17 Q  Are you still a member in any way of the J&M
18    Restaurant, LLC?
19 A  I am not.
20 Q  And you gave up your interest within roughly two weeks
21    of this lawsuit being filed, right?
22 A  No. Much later. This was filed in October, wasn't
23    it?
24 Q  March, wasn't it?
25 A  March, okay.

**Page 197**

1  Q  March of 2010.
2  A  Oh, no. It was after that sometime.
3  Q  A couple weeks, right?
4  A  I thought it was longer. I could be wrong.
5  Q  When did you first tell Otmane Bezzaz that the lawsuit
6     was filed?
7  A  I guess when it was filed.
8  Q  Right after you received service on it?
9  A  I think so.
10 Q  Okay. How did he respond?
11 A  Well, he has a long dislike of the president of Jolan,
12    so he simply accepted it. That's all. There wasn't
13    much comment.
14 Q  What is -- what has he said about Mr. Miyatovich?
15 A  He didn't say anything at the time.
16 Q  Has he said something to you since which leads you to
17    testify that he has a long dislike for him?
18 A  No. I remember before, Miyatovich wouldn't talk to
19    him on the street, so on and so forth. Miyatovich
20    owed him money for a sewer which he never paid, a
21    sewer thing, and so some -- some issues like that came
22    up. So I knew that there was some problems.
23 Q  How long after you formed the J&M Restaurant, LLC did
24    you execute a lease with the J&M Restaurant, LLC as a
25    tenant?

Page 198

1  A  Very soon after. Very soon. I don't know exact.
2         (Exhibit No. 26 marked for
3             identification.)
4
5  Q  (By Mr. Cochran) Exhibit 26 is a November 10, 2009
6     document from the Washington State Liquor Control
7     Board. It lists you as one of the applicants for a
8     liquor license --
9  A  Right.
10 Q  -- for the J&M Restaurant, LLC?
11 A  Correct.
12 Q  You did form part of the group that submitted an
13    application for that?
14 A  Yes.
15 Q  And ultimately J&M received a liquor license, right?
16 A  It did.
17 Q  You submitted a personal and criminal history to the
18    liquor control board?
19 A  Yes.
20 Q  Did you have anything to report?
21 A  No. I was never arrested.
22 Q  It says "source of funds" and there's a section here
23    on Page 2 of this document. It says, "Source of funds
24    and certification, (the total dollar amount of the
25    source of funds and certification must meet or exceed

Page 199

1     the total dollar amount of the outlying costs)" and it
2     lists Bezzaz Otmane [sic], number one, and then
3     yourself number two. Did you submit any kind of
4     financial statement?
5  A  I forgot about that. If I did, I did. It's on
6     record.
7  Q  Then right after that there's a bullet point for a
8     thing called tied-house participation statement. It
9     lists yourself, Bezzaz Otmane and it looks like Saloua
10    Elasmar for that statement. What is that statement?
11 A  I don't know. It's been a long time since I did it.
12    I forget, I filled out some documents, but I forget
13    that I did.
14 Q  Who is Elasmar Saloua?
15 A  Who is who?
16 Q  The person who is listed second in between yourself
17    and Bezzaz.
18 A  Oh. That must be Otmane's wife.
19 Q  Do you know her? Have you met her?
20 A  Yes.
21 Q  Is she a part of the corporation?
22 A  I don't know what -- if she was or not, being married
23    to him, I don't know.
24         (Exhibit No. 27 marked for
25             identification.)

Page 200

1  Q  (By Mr. Cochran) This is another document from the
2     Washington State Liquor Control Board regarding notice
3     of liquor notice application. This identifies you as
4     one of the applicants for the J&M Restaurant, LLC,
5     right?
6  A  Correct, yes.
7         (Exhibit No. 28 marked for
8             identification.)
9
10 Q  (By Mr. Cochran) This Exhibit 28 is a copy of the
11    executed commercial lease that you entered into with
12    the J&M Restaurant as a tenant?
13 A  Yes.
14 Q  Am I correct in understanding this lease called for
15    the lessee, that being J&M Restaurant, to pay $2,000 a
16    month for the lease?
17 A  There was a few provisions made as to time here.
18    Shall I -- what shall I answer? What was the
19    question?
20 Q  I'm wondering, it seems to say in the first sentence
21    or so of the term and rent section that the restaurant
22    LLC would pay $108,000 a year which would be about
23    9,000 a month, but then a sentence or two later it
24    says that the lessee will pay $2,000 per month?
25 A  Yeah, that's -- are you asking me about it?

Page 201

1  Q  Yeah. I'm trying to understand it.
2  A  That would be until the restaurant opens.
3  Q  Okay. On the bottom of that section it says the lease
4     payments are an addition to any dividend or
5     distribution of lessors as the owner of 45 percent of
6     the LLC, and they're talking about you, correct?
7  A  Where are you reading from?
8  Q  The last sentence of that term and rent section.
9  A  Oh, oh. Yes.
10 Q  And your testimony under oath is that you gave up this
11    interest described here in the commercial lease
12    document just because you're a good guy?
13 A  Largely. Also, I wasn't contributing to the
14    installation of the restaurant, and that's about it.
15 Q  What do you mean by that?
16 A  I wasn't contributing to the -- I wasn't helping them
17    with the installation of the restaurant and the
18    honorable thing for me to do was to give that interest
19    back.
20 Q  Was -- where was your obligation to be involved in the
21    installation of the restaurant spelled out?
22 A  There wasn't. It was just a feeling that I should,
23    and I'm a moral person, and I did that.
24 Q  So did anyone bring to your attention the concern that
25    they had that you weren't involved in the installation

### Page 202

1   of the restaurant?
2   A   He never forced me out and said unless you give, you
3       got to get out.  I felt morally I wasn't contributing
4       and that I should not have the 45 percent.
5   Q   Am I correct in understanding that he never raised any
6       issue about you giving up your 45 percent interest?
7              MR. THOMASON:  Objection; misstates
8       testimony.
9              MR. COCHRAN:  Go ahead.
10             THE WITNESS:  You have the --
11      answer, right?  I can answer?
12             MR. THOMASON:  Yeah.
13             THE WITNESS:  We had some
14      discussions, friendly discussions, and no, there was
15      no forcing out by anybody, forcing me out or anything
16      else.
17  Q   (By Mr. Cochran)  I assume that to be the case.  What
18      I'm more interested in is did you give it up
19      voluntarily to avoid it being an asset in this
20      litigation?
21  A   No.
22             (Exhibit No. 29 marked for
23                 identification.)
24
25  Q   (By Mr. Cochran)  Exhibit 29 may answer the question

### Page 203

1   about what a tied-house participation statement is.
2   That's what it appears to be.  It's a document from
3   the Washington State Liquor Control Board.  It appears
4   to have been executed by yourself on November 20,
5   2009; is that accurate?
6   A   I guess so.  I signed a bunch of papers one evening,
7       and I guess I signed -- I'm not even sure what it is.
8   Q   Were you reviewing the papers that you were signing?
9   A   Not thoroughly.
10  Q   Is it fair to say that you do not diligently review
11      documents that you sign?
12  A   Sometimes.  When I trust the people.
13             (Exhibit No. 30 marked for
14                 identification.)
15
16  Q   (By Mr. Cochran)  This is a license investigator
17      initial interview note from the liquor control board
18      for the general restaurant LLC J&M Restaurant, LLC.
19      It says how many members hold more than 10 percent
20      interest, it says two.  That would have been yourself
21      and Bezzaz Otmane, right?
22  A   Yes.
23  Q   On the second section there's a question under the
24      spirits, beer, wine restaurant questions that asks
25      whether you're going to have entertainment, and the

### Page 204

1   answer to the liquor control board was no.  Do you see
2   that?
3   A   No, but at the time we had thought not.
4   Q   And how soon after you started operating did you begin
5       having entertainment?
6   A   Oh, a couple months.  I really don't know exactly.
7   Q   Did you go back and amend your statement?
8   A   I'm sure he did.  He's an honest man.  I'm sure he
9       did.
10  Q   Did you?
11  A   I didn't realize I had to.  I thought he was handling
12      it.  But if we have to -- if he has to, I'll tell him
13      he has to.  I'm sure he did because they've had
14      investigators through there.  I'm sure.
15  Q   Down in the bottom of the second page under the real
16      property section, it lists you as being the owner of
17      the real property and leasing to the LLC.  Under the
18      business section it says "are you buying the business,
19      leasing the business, or creating a new business?"  It
20      says, "In creating new, previous licensee has filed
21      for Chapter 7 and quit the business" and you're
22      talking about Jolan there, right?
23  A   I guess so.
24  Q   Then it says what is the purchase startup date,
25      December of '09, correct?  Do you see that where it

### Page 205

1   says December '09?
2   A   Where it says December 9th?
3   Q   Right.
4   A   Yeah, that didn't occur.
5   Q   Did it start up later than that?
6   A   Yes.
7   Q   When did it start up?
8   A   Sometime mid January.
9   Q   Over on the last page it has a section that says,
10      "Total cost for the business venture" that's the next
11      to the last one, and it's blanked out here in these
12      liquor control documents.  Do you have the originals?
13  A   He may have them in the office.  He may have them in
14      the office.
15  Q   Do you remember what the total overall cost was to
16      get --
17  A   No.
18  Q   -- into the business and how much money it was to open
19      the doors?
20  A   No.
21  Q   It says the source of the funds would come from an
22      investment account, Swiss bank.  Were either of those
23      money that you had?
24  A   Where are you reading from?
25  Q   It says source of funds --

## Page 206

1  A  Yes.
2  Q  -- right underneath that, where is your money coming
3     from?
4  A  Okay.
5  Q  One says an investment account, the other says Swiss
6     bank.  Were either of those places you held funds?
7  A  No.
8  Q  Have you ever held funds at a Swiss bank?
9  A  No.
10 Q  Have you ever held funds in an investment account?
11 A  No.
12              (Exhibit No. 31 marked for
13                 identification.)
14
15 Q  (By Mr. Cochran)  Exhibit 31 is an outline of the
16    costs.  Do you have any recollection of what the costs
17    were?
18 A  No.  As I mentioned earlier, I don't.
19              (Exhibit No. 32 marked for
20                 identification.)
21
22 Q  (By Mr. Cochran)  Is Exhibit 32 a true and accurate
23    copy of the personal and criminal history statement
24    that you submitted for a liquor license on behalf of
25    the J&M Restaurant, LLC?

## Page 207

1  A  I guess so.
2              (Exhibit No. 33 marked for
3                 identification.)
4
5  Q  (By Mr. Cochran)  Mr. Buttnick, if you can look at
6     Exhibit 33 and tell us what this document is.
7  A  Yeah, that's what I -- okay.  What is the question?
8  Q  What is the document?
9  A  It states as to where -- oh, it was my investment in
10    the restaurant, my contribution.
11 Q  Okay.  And was your investment on the source of funds
12    form zero?
13 A  I did not contribute cash, but he used any money that
14    I would have required for a deposit for the
15    restaurant.
16 Q  Right.  Because with Jolan, for example, you required
17    them to pay $200,000 in a rent deposit, right?
18 A  To be given back, yes.
19 Q  As a result of your ownership, you were able to lower
20    the monthly lease, right?
21 A  Correct.
22 Q  So that was what you contributed to the --
23 A  Correct.
24 Q  -- J&M Restaurant as well, right?
25 A  Yes.

## Page 208

1  Q  It says "I have had Mr. Bezzaz as a tenant in this
2     building for the past nine years and we share the same
3     goals for our future."  Tell us about what those were.
4  A  Where are you reading from?
5  Q  This document.
6  A  Number 33?
7  Q  33, right.
8  A  There's only one page that I got.
9  Q  Right.  Right on the --
10 A  Excuse me.
11 Q  -- second paragraph?
12 A  Yeah, I see.  Okay.
13 Q  What are your goals that you share for the future?
14 A  To run a very decent place and nonfights and nondope
15    and just a very upscale restaurant and bar, nobody
16    hitting anybody.
17 Q  Did you change your lease with J&M Restaurant, LLC
18    after you rescinded your 45 percent interest?
19 A  The lease I believe still says it, I believe.  I don't
20    think we've done that yet, but we have to do it.  Just
21    haven't gotten around to it.  I forget.  I really
22    forget about that.
23 Q  Did you require him to pay a market value monthly rent
24    since you rescinded your interest?
25 A  As I mentioned to you, I'm not receiving rent from the

## Page 209

1     J&M right now.
2  Q  Well, you're receiving it but he's just paying it to
3     --
4  A  Exactly.
5  Q  -- Citibank.  I'm saying did you require him to pay a
6     market value for the lease as opposed to a reduced
7     lease as you indicated here in Exhibit 33 since you
8     rescinded your interest?
9  A  I don't think we discussed that.  We just kept the
10    rent as it was before.
11 Q  Have you required a rent deposit of, say, something in
12    the magnitude of $200,000 like you did with Jolan --
13 A  No.
14 Q  -- since you rescinded your interest?
15 A  No, I did not.
16 Q  Do you plan on doing that?
17 A  No.
18 Q  Do you plan on taking back a 45 percent share of the
19    company after you've resolved this lawsuit with Jolan?
20 A  Undecided.
21 Q  Is that an option you and Mr. Bezzaz have discussed?
22 A  Yes, but there's no time on it.  I mean, it could be
23    anytime.  If I decide to do that, we sit down and talk
24    about it.
25 Q  And in the discussions that you've had, have you

53 (Pages 206 to 209)

## Page 210

1 discussed whether there would be anything further you
2 would have to contribute to reassume your 45 percent
3 interest?
4 A   No, it had nothing to do with the lawsuit of J&M.  If
5 I decide to do that, we'll sit and discuss it.
6 Q   Okay.  You probably are not surprised that I find that
7 hard to believe that it's completely untethered to
8 this lawsuit, incredulous about that.
9      Did you amend the articles of incorporation for
10 the company, the J&M Restaurant, LLC, a few short
11 weeks after this lawsuit was filed?
12 A   I believe that was done, but I had nothing to do with
13 it so I don't know.
14 Q   Who did have something to do with it?
15 A   My former partner, Otmane.
16 Q   How about your former lawyer, Mr. Russell?
17 A   Not that I know of.
18         (Exhibit No. 34 marked for
19          identification.)
20
21 Q   (By Mr. Cochran)  This is Exhibit 34, an amended
22 filing with the secretary of state for the J&M
23 Restaurant corporation?
24 A   Okay.
25 Q   Is it?

## Page 211

1 A   I don't know.  I never saw this before I don't think.
2 I never saw this before.  Whatever attorney he hired
3 to do things, he hired.  I know nothing about this.
4 Q   Okay.  This is dated September 30, 2010 as far as you
5 can tell?
6 A   As soon as I see the date I'll tell you.
7 Q   And this removes you from the secretary of state
8 filing with the --
9 A   Yeah, I imagine so.
10 Q   -- with respect to J&M Restaurant?
11 A   I didn't know about it until now.
12 Q   Robie Russell's on here as a registered agent?
13 A   That's fine.
14 Q   For the new company?
15 A   Right.
16 Q   He was the lawyer you were using originally in this
17 lawsuit with Jolan, right?
18 A   Yes, I knew him and used him.
19 Q   Was he Mr. Bezazz's attorney at any point prior to
20 executing this amended report to the secretary of
21 state?
22 A   Bezzaz may have used him.  I forget, but it wouldn't
23 bother me at all if he did.
24         (Exhibit No. 35 marked for
25          identification.)

## Page 212

1 Q   (By Mr. Cochran)  Exhibit 35 is an initial annual
2 report that was made by the J&M Restaurant to the
3 secretary of state?
4 A   Okay.  First time I've seen this.
5 Q   Otmane Bezzaz submitted it on April 23 of 2010?
6 A   Yes.
7 Q   Do you know how close in time that was to the filing
8 of the lawsuit by Jolan against you?
9 A   What date again was this?  This was 5 -- is it May
10 3rd?
11 Q   This looks like April 23rd --
12 A   Okay.
13 Q   -- that it was submitted.  Do you know how close in
14 time that was to the filing of the suit?
15 A   When was the lawsuit, in March?
16 Q   Or April.  Did we mark that?
17         MR. THOMASON:  This is not an
18 exhibit, but here's a file stamp.
19         MR. COCHRAN:  April 23, 2010.  Real
20 close in time.
21         (Exhibit No. 36 marked for
22          identification.)
23
24 Q   (By Mr. Cochran)  This is a copy of a complaint for
25 damages that Joan and Lance Miyatovich filed against

## Page 213

1 you.  You'll see the date on the back page as being
2 April 23, 2010.
3 A   Okay.
4 Q   And did you advise Mr. Bezzaz to go down and file an
5 amended document with the secretary of state about who
6 owned the J&M Restaurant?
7 A   Didn't advise Otmane anything.  That was his business.
8 Q   Did he go immediately from learning from you that
9 there was a lawsuit down to Olympia to file this
10 initial annual report we see as Exhibit 35?
11 A   As I said, I don't know when he went to Olympia.  I
12 resigned my stock and he took care of it from there.
13 Q   Did you resign it on -- did you resign it orally to
14 him on April 23, 2010 and is that why he took you off
15 of the filing with the secretary of state that day?
16 A   Couldn't come off until I signed papers, got rid of it
17 as far as I know.
18 Q   Did you have an understanding of why he didn't list
19 you as a member in the corporation on this April 23,
20 2010 submission with the secretary of state?
21 A   Well, according to the rescission, when did I sign the
22 rescission?  I don't have that.
23 Q   Better question posed to you.
24 A   Okay.  I'll have to get my paperwork and find out.  I
25 had nothing to do with anything that Otmane did.

|   |   |
|---|---|
| 1  Q  Let me ask you this: Did you authorize Otmane Bezzaz | 1  in 2010? |
| 2     to remove you from the corporate documents that were | 2  A  I have no idea. |
| 3     filed with the secretary of state on April 23, 2010? | 3  Q  Really? |
| 4  A  I forget when we had our meetings or anything else. | 4  A  That's correct. |
| 5           (Exhibit No. 37 marked for | 5  Q  You really don't have any idea? |
| 6              identification.) | 6  A  No. |
| 7 | 7  Q  What was the security deposit you were proposing to |
| 8           THE WITNESS: I didn't keep -- | 8     Mahoney? |
| 9  Q  (By Mr. Cochran) Is it possible -- | 9  A  I forget. What was it? |
| 10  A  I don't keep a diary. | 10  Q  We'll pull out the lease here I guess if you wanted |
| 11  Q  Is it possible that you authorized him to remove you | 11     to. |
| 12     from the corporate documents that he filed with the | 12     The Recital No. 1 on rescission for good and |
| 13     secretary of state on April 23, 2010? | 13     valuable consideration. What was the good and |
| 14           MR. THOMASON: Calls for | 14     valuable consideration that you received? |
| 15     speculation. | 15  A  I don't know what consideration means. I know he gave |
| 16        Go ahead. | 16     me the stock, and as far as any security deposit, it |
| 17           THE WITNESS: As I say, I don't keep | 17     depends on the person a lot. |
| 18     a diary. I don't know when we talked about it or | 18  Q  No. I mean, this says you gave -- you gave |
| 19     anything else. All I know is a rescission agreement | 19     consideration to enter into this agreement. What did |
| 20     is signed. The date is on there. | 20     you get? You were giving up your 45 percent interest |
| 21           MR. COCHRAN: Let's look at that | 21     in a going concern, the J&M Restaurant, LLC. What did |
| 22     one. | 22     you get in return? |
| 23           (Exhibit No. 37 marked for | 23  A  I'm not a lawyer. I can't answer that. |
| 24              identification.) | 24  Q  What -- you're an executor to this document. |
| 25 | 25  A  I understand. But it must have been something there. |
| Page 214 | Page 216 |
| 1  Q  (By Mr. Cochran) This is -- is Exhibit 37 a copy of | 1     I just don't understand what that would be and I would |
| 2     that rescission agreement? | 2     have to consult with an attorney. |
| 3  A  Yes. | 3  Q  Did you have legal counsel to consult with when you |
| 4  Q  Who drafted this? | 4     signed this? |
| 5  A  Otmane's attorney. | 5  A  No, I did not. |
| 6  Q  Who is that? | 6  Q  This says for good and valuable consideration, the |
| 7  A  I do not know. I imagine his attorney, but I know he | 7     receipt of which is hereby acknowledged. The parties |
| 8     had it drafted. I don't know if he's capable of doing | 8     mutually agree that on or before September 30, 2012 |
| 9     that or not. | 9     you, Mr. Buttnick, may exercise an option to purchase |
| 10  Q  Did Robie Russell do it? | 10     an ownership interest in the LLC under the same terms |
| 11  A  No. | 11     and conditions as the original agreement, right? |
| 12  Q  It's dated May 2nd, 2010, correct? | 12  A  Yes, that's what it says. |
| 13  A  Yes. | 13  Q  Essentially, and by the time September 30, 2012 rolls |
| 14  Q  You executed it, right? | 14     around, you're just going to step right back into a 45 |
| 15  A  I signed it, yeah. | 15     percent interest in the business, right? |
| 16  Q  It's not exactly accurate to say that you did not | 16  A  I don't know. The attorneys will have to let me know |
| 17     contribute any funds for the formation or operation, | 17     about that. |
| 18     because you in fact elected not to take a $200,000 | 18           MR. THOMASON: Do you mind if we |
| 19     security deposit and you reduced the monthly rent, | 19     take a quick break? |
| 20     right? | 20           MR. COCHRAN: No, not at all. |
| 21  A  Who said it was 200,000? | 21           (Recess 4:43 to 4:50 p.m.) |
| 22  Q  That's what you charged Jolan in 1993. | 22 |
| 23  A  No relation to this. | 23  Q  (By Mr. Cochran) I wanted to confirm just a few |
| 24  Q  Well, was the -- what was the market rate for a | 24     things we touched on earlier. You had offered to buy |
| 25     security deposit on a commercial enterprise like J&M | 25     the J&M business for $10,000 in the bankruptcy |
| Page 215 | Page 217 |